IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
EASTERN DIVISION
CIVIL ACTION FILE NO.: 4:23-CV-00071

| | |
|---|---|
| JAMES RODNEY GILLIKIN, | ) |
| Plaintiff, | ) |
| Vs. | ) **COMPLAINT** |
| JEAN MARIE, INCORPORATED, | ) |
| Defendant. | ) |

**THIS ACTION IS BROUGHT PURSUANT TO 28 U.S.C. § 1916 AND UNDER THE SPECIAL RULES FOR SEAMEN TO SUE WITHOUT PREPAYMENT OF COSTS AND WITHOUT SECURITY THEREFORE.**

The Plaintiff, JAMES RODNEY GILLIKIN, complaining of the Defendant JEAN MARIE, INCORPORATED, alleges and says:

**JURISDICTION AND PARTIES**

1. Plaintiff, JAMES RODNEY GILLIKIN ("MR. GILLIKIN"), is a citizen and resident of the County of Carteret, State of North Carolina. At all material times, MR. GILLIKIN was employed by JEAN MARIE, INCORPORATED ("JMI") as a member of the crew of the *FV JEAN MARIE* ("the *JEAN MARIE*").

2. The *JEAN MARIE*, USCG Official No. 600204, her engines, tackle apparel, etc., built in 1978 is a fishing vessel, 21.98 meters in length, 6.75 meters in width with a hailing port of Newport, North Carolina, and was and is employed in the service of a scalloping vessel. The *JEAN MARIE* is owned and operated by JMI, a North Carolina Corporation with its principal office and

place of business at 119 Sir Christopher Drive, Newport, NC 28570, and at all times relevant herein, was engaged in the North Atlantic Scallop fishing under Northeast Federal Fishing Permit Number: 330288, which contained, among other permits, limited access, full time, small dredge permit.

3. At all times relevant hereto the *JEAN MARIE* was captained by Shelton E. Harvell, Jr., who is domiciled in Carteret County, North Carolina. Upon information and belief, Captain Harvell is, and was in May and June 2020, an agent and President of JMI and a part owner in JMI.

4. MR. GILLIKIN was a seaman employed by JMI as a member of the crew of the *JEAN MARIE* on or about May 24, 2020. Although an experienced scalloper, this was MR. GILLIKIN's first trip on the *JEAN MARIE*. On or about May 24, 2020, MR. GILLIKIN was seriously and permanently injured in the performance of his duties in the service of the *JEAN MARIE* while lifting a 50 lb. bag of scallops over his head to throw the bag into a scallop bin. MR. GILLIKIN injured his upper left arm and bicep tendon. MR. GILLIKIN's injuries were proximately caused by the negligence of JMI and the unseaworthiness of the vessel, the *JEAN MARIE*.

5. This is a claim for negligence under the Jones Act, 46 U.S.C. § 30104 *et. seq.*, and for unseaworthiness and maintenance and cure under the General Maritime Law. Jurisdiction is based on 28 U.S.C. § 1331 (federal question) and pursuant to 28 U.S.C. Section 1333 (admiralty and maritime jurisdiction) and venue is proper.

## BACKGROUND

6. In May 2020, MR. GILLIKIN suffered a serious injury to his left shoulder while working on a scalloping voyage aboard the *JEAN MARIE* due to the negligence and unseaworthiness of the *JEAN MARIE,* its Captain, and its owner. The voyage began around May 19, 2020, when *JEAN MARIE* left Beaufort, North Carolina, and went to Hampton, Virginia.

Because of bad weather, the vessel lay there for four (4) or five (5) days and stayed at port. On or about May 24, 2020, the *JEAN MARIE* left Hampton on a scalloping voyage to New Bedford, Massachusetts. MR. GILLIKIN was onboard along with four other crew members including the Captain.

7. Mr. GILLIKIN served on the crew of the *JEAN MARIE* as a deckhand. His primary duty was to store and ice 50-pound bags of scallops in the bins in the hold of the vessel. His duties also included handling gear, opening scallops, and helping out on the deck of the vessel. MR. GILLIKIN was injured a few days after leaving Hampton while the vessel was out in the ocean, approximately 40 miles off the shore of Cape May, New Jersey.

8. MR. GILLIKIN's shoulder injury occurred while performing the required work task of lifting a 50-pound bag of scallops over his head to throw into a tall bin filled with ice and scallops in the hold of the vessel. The only reason he had to lift the bag of scallops so high, and the only reason his left shoulder was injured, is because the bins that the *JEAN MARIE* and its Captain and owner used to store scallops were unnecessarily overfilled with ice requiring the available bins to be loaded much higher than was safe, reasonable, or prudent under the circumstances.

9. The ice scallop/hold of the vessel was approximately 9' high from ceiling to floor (or 9' deep from the deck), 30' long, and 20' wide. The vessel had approximately 8-12 bins to hold ice and scallops, with five or six bins on each side of the vessel. A hallway approximately 2.5' wide separated each side of the bins. Each bin was approximately 10'-12' long, 5' wide', and 9' high.

10. Prior to departing on the voyage to scallop off of New Jersey, the Captain had all the bins in the hold completely filled with ice up to the top, with the exception of only two bins

which were filled with approximately one foot of ice each and far more ice than the vessel needed for the trip. Also, the Captain had the small aisleway between the bins filled with ice and groceries so that the crewmembers had to stand on ice and a slippery floor in a confined little space while working. These actions were improper and negligent.

11. On the date of the incident, the *JEAN MARIE* was scallop fishing. MR. GILLIKIN was engaged in and performing work performed by traditional seamen as other crew members of the vessel, and as such was entitled to a safe and seaworthy vessel.

12. About three (3) days after May 24, 2020, MR. GILLIKIN was injured while he was performing his assigned duties. MR. GILLIKIN injured his left shoulder and biceps while lifting a 50-pound bag of scallops all the way up over his head and throwing that bag into a high-up and full bin packed with ice and scallops. The work of loading scallops into the ice bin required two workers down in the hold of the vessel. There would also be two men on the deck who would pass the 50-pound bags to one of the men in the hold. This man would hand the bag to the other man who would have to lift and toss the bag into the bin of ice. Mr. GILLIKIN was the last worker in this line of workers at the time of his injury and he was the person required to lift the bag of scallops high enough to throw it into the ice bin using his shoulders and upper body.

13. At the time the *JEAN MARIE* set out on the voyage, there were only two bins in the hold which were not already full of ice. There was extremely limited space to stack the scallops and MR. GILLIKIN would have to lift the bags much higher than if the vessel started with a reasonable and standard amount of ice. The bins in the hold are never meant to be filled to the top, yet they were on this voyage despite the safety and injury risks caused by having this much ice on board.

14. Being required to lift heavy bags of scallops over one's head is not the normal and

standard height for lifting these types of bags for similar scallop fishermen under similar circumstances on other vessels (normally, one would not have to lift heavy scallop bags above chest high). This type of heavy lifting creates an unsafe lifting position or condition, putting a major strain on the shoulders and upper body and creating the risk of suffering a serious shoulder injury after consistently lifting heavy bags over the head, especially on a slippery floor.

15. At the time of MR. GILLIKIN's injury, he was lifting a 50-pound bag into an ice bin that was filled higher than normal with ice and scallops. As he lifted the heavy scallop bag over his head and threw it into the bin, MR. GILLIKIN felt an immediate rush of severe pain in his left shoulder that felt like a hot iron on the back of his shoulder. He yelled out in pain and immediately knew that he had torn something and suffered some kind of serious shoulder injury. MR. GILLIKIN was not able to finish loading the bags of scallops after his shoulder injury and the other deckhand working with him had to load the rest of the bags.

16. After his shoulder injury, MR. GILLIKIN reported to the Captain that he had suffered a severe shoulder injury and that something was very likely torn. When MR. GILLIKIN told Captain Harvell that he was hurt, Captain Harvell told MR. GILLIKIN "we have to get the trip in". Instead of heading to shore so that MR. GILLIKIN could receive medical treatment, the *JEAN MARIE* continued scalloping at sea without returning to port for seven more days after MR. GILLIKIN was injured.

17. During this seven-day period, MR. GILLIKIN was in severe pain and unable to use his left shoulder or arm due to his injury. Before returning to shore, the Captain, knowing of MR. GILLIKIN'S injury, ordered that MR. GILLIKIN no longer load 50-pound bags of scallops in the hold of the ship. However, during this time the Captain still forced MR. GILLIKIN to continue working even though he was injured, including being forced to perform tasks that required him to

use his injured left arm. This caused him additional pain and aggravated his severe injury. For example, MR. GILLIKIN was required to shuck scallops, and shove and drag large baskets of scallops along the deck for the rest of the trip. Other crew members had to help MR. GILLIKIN with this work as he limited the use of his left arm because the condition of his left arm and shoulder continued to worsen throughout the remainder of the voyage. MR. GILLIKIN suffered additional injury from being required to work after reporting his injury.

18. When the *JEAN MARIE* finally returned to New Bedford, MA, Captain Harvell made MR. GILLIKIN stay there and continue working on the *JEAN MARIE* instead of letting him go get medical attention. They arrived at port in New Bedford at daybreak and it was 4 or 5 o'clock in the afternoon before the Captain let MR. GILLIKIN go. MR. GILLKIN was then able to rent a car and return home to Gloucester, NC.

19. On June 4, 2020, the next day after returning home to North Carolina from the scalloping voyage, MR. GILLIKIN sought medical treatment for his severe shoulder and neck pain at the Carolinas Center for Surgery Urgent Care in Morehead City. MR. GILLIKIN was unable to lift his left arm and had decreased range of motion. He was diagnosed with a strain of muscle in his left shoulder and was referred to Carteret Surgical Associates PA for an orthopedic evaluation.

20. On June 8, 2020, MR. GILLIKIN was seen by Earl Frantz, DO, at the Carteret Surgical Associates PA. He was diagnosed with left shoulder pain, primary osteoarthritis of the left shoulder, subacromial bursitis, and rotator cuff tear/rupture. His plan of treatment included an at-home exercise program, left shoulder injections, and an MRI. He was instructed to follow up in eight weeks.

21. Dr. Thomas Bates at Carteret Surgical Associates PA examined MR. GILLIKIN on August 20, 2020. Dr. Bates found signs of subacromial impingement, partial thickness tear of the

rotator cuff as well as glenoid labral tearing in MR. GILLIKIN's left shoulder. As a result, on September 2, 2020. Dr. Bates performed arthroscopic surgery on MR. GILLIKIN's left shoulder.

22. Despite this surgery and a lengthy course of physical therapy, MR. GILLIKIN still has significant left shoulder pain and limitation of movement in his left shoulder. MR. GILLIKIN cannot return to work on a scallop or a shrimp boat because of the shoulder pain and his limitations and lifting restrictions. Until his injury, MR. GILLIKIN spent his entire career in the maritime industry, working primarily on scallop and shrimp boats.

23. At all times relevant hereto, MR. GILLIKIN was exercising due care for his own safety and well-being.

24. Following the surgery, MR. GILLIKIN suffered severe pain and continues to suffer severe pain.

25. As a direct and proximate result of the injuries sustained by him on or about May 24, 2020, MR. GILLIKIN developed and has suffered a career-ending, life-altering injury.

26. MR. GILLIKIN was age 55 at the time of his injury. MR. GILLIKIN has been unfit for duty since his injury and is unable to return to work as a scalloper or commercial fisherman.

27. MR. GILLIKIN suffered a permanent injury to his left shoulder caused by the requirement to lift 50+-pound bags of scallops over his head while working on the *JEAN MARIE* scalloping vessel. MR. GILLIKIN also suffered adhesive capsulitis or capsular contracture in both shoulders caused by the May 2020 injury event, with the injury to his right arm and shoulder coming afterward due to overuse following the initial injury to the left arm and shoulder.

28. MR. GILLIKIN's injuries were caused by his assigned work incidents and are permanent injuries and his symptoms, including, but not limited to, pain, limited range of motion

with his left arm, and decreased ability to lift will be present for the rest of his life. MR. GILLIKIN will likely have permanent lifting restrictions in place based on his injuries caused by the May 2020 boating incident of no lifting greater than 20 lbs. MR. GILLIKIN cannot return to work as a scallop fisherman based on the lifting requirements and other physical demands of that job, and he will not be able to return to this type of work for the rest of his life.

29. Based upon his tax returns from 2017-2019, MR. GILLIKIN averaged a net income from commercial fishing of $41,000 per year. Accordingly, MR. GILLIKIN has past income lost based on net earnings from commercial fishing of $41,000 per year.

30. Also using this 2017-2019 period as a benchmark for MR. GILLIKIN's future earning potential, MR. GILLIKIN would have earned $41,000 a year until he retired had he not been injured by JMI's negligence and the vessel's unseaworthiness. MR. GILLIKIN was only 55 years old in May 2020. Using a projected retirement age of 66 years old, MR. GILLIKIN would have been projected to work as a seaman for 11 more years if he had not been injured. His future earning capacity has been diminished by at least $41,000 per year.

31. In addition to lost earnings, MR. GILLIKIN has lost the benefits of room and board.

32. MR. GILLIKIN is now 58 years of age. Based on the North Carolina Mortality Tables, N.C.G.S. § 8-46, MR. GILLIKIN has a life expectancy of 22.7 years. MR. GILLIKIN has suffered a severe permanent injury to his arms and shoulders and upper back that leaves him in persistent pain and severe limitations. This injury has prevented MR. GILLIKIN from returning to his career as a scalloper or any gainful commercial fishing activity. He also cannot do the things he used to enjoy, nor will ever be able to again.

33. As a direct and proximate result of the injuries he sustained, MR. GILLIKIN has (a) sustained permanent pain, suffering, loss of use of parts of his body, and will continue to do so in the future; (b) upon information and belief will incur expenses for medical care, and treatment in the future; and (c) has incurred a loss of earnings due to his injuries and will continue to do so in the future and has sustained a loss of earning capacity.

## FIRST CLAIM
### (Jones Act, 46 U.S.C. § 30104)

34. MR. GILLIKIN realleges each and every allegation set forth in all preceding and foregoing paragraphs as if fully restated herein.

35. MR. GILLIKIN makes his claim pursuant to the Jones Act, Title 46 U.S.C. § 30104 et seq. At all times material herein, MR. GILLIKIN was employed by JMI as a crewmember of the *JEAN MARIE*. JMI and *JEAN MARIE* owed a duty to MR. GILLIKIN to exercise reasonable care.

36. The *JEAN MARIE* was operated, controlled, managed, and maintained in a careless, negligent, careless, reckless, and grossly negligent manner.

37. JMI, by reason of the negligence of its agents, servants, employees, and the master of the vessel, was negligent in the following particulars, among others:

   a. Breach of duty to provide MR. GILLIKIN with a safe place to work including safe methods for the loading and packing of scallops in the bins in the hold of the *JEAN MARIE*;

   b. Breach of duty to provide adequate equipment for the loading and packing of scallops in the bins in the hold of the *JEAN MARIE*;

   c. Breach of duty to correct dangerous conditions on the vessel after having notice of the same by Captain and crew;

   d. Breach of duty to have adequate safety guidelines, protocols, and practices in effect for the loading and packing of scallops;

   e. Breach of duty to have proper and safe equipment;

   f. Breach of duty to maintain the hold and bins of the *JEAN MARIE* in a reasonably

      safe and seaworthy condition;

g. Breach of duty to provide proper safety measures and to promulgate and/or enforce proper safety and operating rules;

h. Breach of duty to follow industry safety standards and customs against lifting heavy objects above shoulders;

i. Breach of duty to follow industry safety standards and customs against awkward posture while lifting heavy objects above shoulders;

j. Breach of duty to have proper safety protocols and equipment to deal with injuries;

k. Breach of duty to provide a seaworthy vessel fit for its intended use;

l. Breach of duty to provide safe access to and from all parts of the vessel;

m. Breach of duty to provide cure by continuing on the voyage and failing to promptly take MR. GILLIKIN ashore to receive medical care;

n. Breach of duty to exercise reasonable care under the circumstances;

o. By having an unseaworthy vessel and committing the acts and omissions as set out in the below list regarding our Unseaworthiness claims; and

p. Was negligent in such other particulars as shall be shown at trial.

38. The negligence of JMI, its officers, agents or employees, was a direct and proximate cause of MR. GILLIKIN's injuries.

39. As a direct and proximate result of the negligence of JMI, MR. GILLIKIN suffered, and continues to suffer, severe bodily injuries and permanent impairment and pain and suffering past, present and future, and has incurred medical expenses and lost wages, past, present and future, and impairment of earning capacity.

40. As a direct and proximate result of the negligence of JMI, and the resulting bodily injuries, pain and suffering, medical expenses and lost wages and impairment of earning capacity of MR. GILLIKIN, MR. GILLIKIN is entitled to recover damages from JMI inclusive of interest and costs.

## SECOND CLAIM
### (Unseaworthiness under the General Maritime Law)

41. MR. GILLIKIN realleges each and every allegation set forth in all preceding and foregoing paragraphs as if fully restated herein.

42. JMI, as operator, owner of the *JEAN MARIE,* owed a duty to MR. GILLIKIN to provide him a vessel that was in all respects seaworthy, staunch, and fit for her intended purpose.

43. JMI, as the owner/operator of the *JEAN MARIE*, violated its non-delegable duty to provide MR. GILLIKIN with a seaworthy vessel and/or safe place to work.

44. The *JEAN MARIE* was unseaworthy in that, among other things, the vessel was not properly equipped and manned, not properly supervised, and the vessel failed to provide a safe work area for the crew in the following particulars, among others:

   a. Breaching each of the respective duties listed above;
   b. Allowing a dangerous condition to exist on the *JEAN MARIE* by allowing all of the bins used for packing and loading scallops to be packed with ice;
   c. Failing to maintain the hold and bins of the *JEAN MARIE* in a reasonably safe and seaworthy condition;
   d. Failing to have proper and safe equipment;
   e. Failing to correct a dangerous condition;
   f. Failing to have a properly trained captain competent to promptly assess injuries and make provision for the prompt care and treatment of serious medical conditions;
   g. Failing to follow industry safety standards and customs for lifting;
   h. Failing to provide a seaworthy vessel fit for its intended use; and
   i. Was unseaworthy in such other particulars as shall be shown at trial.

45. JMI was required to provide a satisfactory means to allow MR. GILLIKIN to get to and from all parts of the vessel used in the necessary work of the vessel.

46. The unseaworthiness of the *JEAN MARIE* was a direct and proximate cause of MR. GILLIKIN's injuries.

47. As a direct and proximate result of the unseaworthiness of JMI, MR. GILLIKIN suffered, and continues to suffer, severe bodily injuries and permanent impairment and pain and suffering, past, present, and future, and has incurred medical expenses and lost wages, past, present and future, and impairment of earning capacity.

48. As a direct and proximate result of the unseaworthiness of the *JEAN MARIE*, and the resulting bodily injuries, pain and suffering, medical expenses, lost wages, and impairment of earning capacity of MR. GILLIKIN, MR. GILLIKIN is entitled to recover damages from JMI inclusive of interest and costs.

49. The owner of the *JEAN MARIE* was on board as Captain and operating the vessel at the time of the incident.

50. The owner and captain of the vessel knowingly operated the *JEAN MARIE* in an unseaworthy condition.

51. The *JEAN MARIE* was operated, controlled, managed, and maintained in a careless, negligent, careless, reckless, and grossly negligent manner.

52. The *JEAN MARIE* was permitted and allowed to go upon the waters in an unsafe and unseaworthy condition and that such condition of said vessel and any and all damages and injuries were done, occasioned and incurred with the privity or knowledge of the JMI, its officers, agents, servants or employees at or prior to the commencement of the voyage and throughout the voyage.

53. JMI, its officers, agents, servants, employees, and/or other persons for whom JMI were and are responsible, failed to take suitable precautions for the safety of MR. GILLIKIN under the circumstances and conditions then existing to the knowledge of JMI, the said JMI having actual and constructive notice of the unsafe, dangerous and unseaworthy conditions.

## THIRD CLAIM
### (Maintenance and Cure)

54. MR. GILLIKIN realleges each and every allegation set forth in all preceding and foregoing paragraphs as if fully restated herein.

55. About three (3) days after May 24, 2020, MR. GILLIKIN was injured while in service of the vessel. As a result, JMI had a non-delegable duty to provide MR. GILLIKIN with maintenance and cure, immediately upon being notified of MR. GILLIKIN'S serious injury. The Captain of the *JEAN MARIE* failed to promptly bring MR. GILLIKIN ashore for medical care but forced him to work with one arm on deck for seven (7) more days while the *JEAN MARIE* continued fishing.

56. MR. GILLIKIN, because of his service to the *JEAN MARIE*, and his injuries sustained while in the service of that vessel, is entitled to recover from JMI maintenance and cure from the time of his injury to such time as he reaches maximum medical improvement, together with those attorney fees and expenses incurred in prosecuting his claims for maintenance and cure.

57. In September 2020, MR. GILLIKIN made a demand for maintenance and cure from the time he was ashore and since that time the *JEAN MARIE* has fulfilled her obligations of maintenance and cure.

58. MR. GILLIKIN was injured about three (3) days after May 24, 2020, and yet the Captain continued on the fishing voyage, failing to bring MR. GILLIKIN ashore for medical care or cure, for seven (7) more days.

59. The failure of the *JEAN MARIE* to provide immediate cure resulted in additional injury to MR. GILLIKIN's left arm and caused injury to his right upper arm.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiff, JAMES RODNEY GILLIKIN, respectfully prays for the following:

1. Judgment against Defendant, JEAN MARIE, INCORPORATED, for and including:

    a. Compensatory damages in the amount of $2,000,000.00, including but not limited to, compensation for bodily injury, pain and suffering, medical expenses and lost wages and loss of earning capacity, inclusive of interest and costs;

    b. Pre-judgment and post-judgment interest; and

    c. For costs;

2. A trial by jury; and

3. And for any and all other such relief as the Court may deem just and proper.

This the 28th day of April, 2023.

**ZAYTOUN & BALLEW, PLLC**

By: /s/ Robert E. Zaytoun
Robert E. Zaytoun (NC Bar No. 6942)
rzaytoun@zaytounlaw.com
Charles K. McCotter, Of Counsel (NC Bar No. 5018)
Matthew D. Ballew (NC Bar No. 39515)
mballew@zaytounlaw.com
Paul J. Puryear, Jr. (NC Bar No. 41536)
pjpuryear@zaytounlaw.com
3130 Fairhill Dr., Suite 100
Raleigh, NC 27612
Telephone: (919) 832-6690
Facsimile: (919) 831-4793